## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PRERACIO WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:22-CV-1300-MAB[1] |
| | ) | |
| KIMBERLY BILLINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on Plaintiff Preracio Williams' Motion for Default Judgment against Defendant Kimberly Billington (Doc. 29). The Court considered Plaintiff's Motion for Default Judgment in February 2024 and held that default judgment should be entered against Defendant Billington (Doc. 32). However, because Plaintiff's damages were not liquidated or otherwise easy to calculate, the Court's prior Order refrained from determining Plaintiff's damages and set the matter for an evidentiary hearing (*Id.*; *see also* Doc. 33).

The evidentiary hearing to determine damages was held on April 30, 2024 (Docs. 35, 36). Thereafter, Plaintiff filed a post-hearing Brief and exhibits in support of his requested damages (*see* Doc. 42). For the reasons discussed below, the Court **GRANTS** Plaintiff's Motion for Default Judgment against Defendant Billington and awards Plaintiff $500,000 in compensatory damages and $1,000,000 in punitive damages.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (*see* Doc. 21).

## BACKGROUND

Plaintiff filed this action against Defendant Billington pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while he was incarcerated at Lawrence Correctional Center (Doc. 1). Plaintiff alleges that Billington was employed as a supervisor in the dietary unit at Lawrence where Plaintiff worked (*see* Doc. 1 at p. 6). In March 2020, Billington began flirting with Plaintiff and making inappropriate comments (*Id.*). Billington wrote notes to Plaintiff and delivered them by leaving the notes in Plaintiff's shoes (inmates working in dietary remove their regular shoes and wear different shoes during their shift) (*Id.* at p. 7). Plaintiff repeatedly told Billington that he was not interested and asked her to stop writing him notes (*Id.*). Billington did not take Plaintiff's disinterest kindly, however, and instead threatened to tell Internal Affairs that Plaintiff was involved in gang activity if he did not begin doing what she wanted (*Id.*). Billington warned Plaintiff that his story would not be believed because he was a black, male inmate and she was a white, female supervisor (*Id.*). Thus, the letters continued and often described various sexual acts Billington wanted Plaintiff to perform on her (*Id.* at p. 8).

Things escalated further when Billington began instructing Plaintiff to assist her with tasks in the dietary unit's closets (*Id.*). Once in the closet, Billington forcefully kissed Plaintiff and demanded he kiss her back and fondle her (*Id.*). On one such occasion, Billington demanded Plaintiff pull down his pants and then performed oral sex on him, while repeatedly placing her finger in Plaintiff's anus (*Id.*). When Plaintiff ejaculated, Billington took Plaintiff's semen in her hand and reached down to her crotch (*Id.*).

Billington then threatened to tell Internal Affairs that Plaintiff raped her if he told anyone about what had occurred (*Id.* at p. 9).

At some point between May and July 2020, Billington provided Plaintiff with her personal phone number and demanded he call her while she was at home (*Id.*). However, Plaintiff did not call Billington for several weeks (*Id.*). When Billington asked Plaintiff why he had not called, he falsely (but understandably) told her that his counselor had not updated his phone list (*Id.*). Billington then contacted the individual responsible for approving Plaintiff's updated phone list (presumably his counselor) and learned that Plaintiff was lying as he had not attempted to update his phone list (*Id.*). In response, Billington threatened to call the judge presiding over Plaintiff's criminal proceedings to report that he had raped her if Plaintiff did not submit an updated phone list and call her (*Id.*). Consequently, Plaintiff complied with Billington's demands and called her while she was at home on multiple occasions (*Id.* at pp. 9-10). During the calls, Billington would masturbate while speaking with Plaintiff (*Id.* at p. 10).

On another occasion between July and November of 2020, Billington demanded Plaintiff allow her to perform oral sex on him (*Id.*). Afterward, Billington then forced Plaintiff to perform oral sex on her (*Id.*). However, Billington was menstruating at that time and Plaintiff nearly vomited while being forced to perform this act because of Billington's menstrual bleeding (*Id.*). Billington made more threats after the encounter, going so far as to hand Plaintiff a piece of paper containing the names, addresses, and phone numbers of his family members (*Id.*).

Billington was temporarily suspended at some point in November 2020 and things only worsened upon her return (*Id.* at p. 11). Billington again demanded Plaintiff meet her in a supply closet in the dietary unit (*Id.*). She then pulled Plaintiff's pants down, demanded he have penetrative sex with her, ignored his pleas for a condom, and threatened to scream "rape" if he didn't penetrate her at once (*Id.*). Plaintiff complied and was forced to have sexual intercourse with Billington until she eventually told him to leave when he could not remain erect (*Id.*). Billington continued to sexually harass Plaintiff until August 2021, when he was placed on investigative status and his cell was searched (*Id.* at p. 12). The officers searching Plaintiff's cell found several of Billington's notes to Plaintiff, as well as contraband cigarettes she had given him (*Id.*). Although Plaintiff was initially hesitant to disclose any details of Billington's actions due to his fear of retaliation and distrust of the prison system, he eventually spoke with Internal Affairs about Billington's conduct and submitted a Prisoner Rape Elimination Act ("PREA") report, which was found to be substantiated by the Illinois Department of Corrections (*Id.* at p. 13; *see also* Doc. 40).

The Court conducted a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A and Plaintiff was permitted to proceed on the following claims:

> **Count 1**: Eighth Amendment cruel and unusual punishment claim against Kimberly Billington for sexually assaulting Williams on numerous occasions.

> **Count 2**: First Amendment retaliation claim against Kimberly Billington for threatening retaliatory conduct against Williams in retaliation for not complying with her sexual demands.

> **Count 3**: Illinois State law claim of assault and/or battery.

> **Count 4**: Illinois State law claim of intentional infliction of emotional
> distress.

(Doc. 11 at pp. 3-5). The Court's Preliminary Review Order also granted Plaintiff's Motion
for Recruitment of Counsel (*Id.* at pp. 4). Shortly thereafter, Attorney Stephen Y. Wu was
recruited to represent Plaintiff (Doc. 16).

On January 10, 2023, Defendant Billington executed a Waiver of Service of
Summons (Doc. 20) and filed a form consenting to proceed before a magistrate judge
(Doc. 19). Therefore, Billington's responsive pleading was due on or before February 21,
2023 (*see* Doc. 20). Nevertheless, Billington did not file an answer or other responsive
pleading by that deadline. Accordingly, on April 18, 2023, the undersigned directed the
Clerk of Court to enter default against Billington pursuant to Federal Rule of Civil
Procedure 55(a) (Doc. 23). The Clerk's Entry of Default was entered one day later (Doc.
24). Both the Court's Order (Doc. 23) and the Clerk's Entry of Default (Doc. 24) were sent
to Billington by certified mail. A return of service form indicates that Billington received
those documents on April 24, 2023 (Doc. 25).

On May 17, 2023, Plaintiff filed the instant Motion for Default Judgment and
supporting memorandum pursuant to Federal Rule of Civil Procedure 55(b) (Docs. 29,
30). On February 8, 2024, the Court granted Plaintiff's Motion for Default Judgment as it
related to Billington's liability (*see* Doc. 32). Specifically, the Court found that Billington
had willfully disregarded the pending litigation and held that default judgment should
be entered against her (*Id.* at pp. 2-3). However, the Court's Order did not determine the
amount of damages to award Plaintiff (*Id.*). Instead, pursuant to Seventh Circuit

precedent, the Court set this matter for an evidentiary hearing to determine damages (*Id.*) (citing *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012)).

The evidentiary hearing to determine damages was held on April 30, 2024 (Docs. 35, 36). At the hearing, the Court heard witness testimony from Plaintiff and Plaintiff's mother, Ms. Dorothy Williams (*see* Doc. 35). The Court also received additional evidence from Plaintiff (*see* Docs. 37, 38, 39, 40, 41) and heard oral arguments from Plaintiff's counsel (*see generally* Doc. 36). Billington did not appear at the hearing (Doc. 35). Finally, on June 14, 2024, Plaintiff submitted a post-hearing Brief to support his request for $500,000 in compensatory damages and $1,000,000 in punitive damages (*see* Doc. 42).

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 establishes a two-step process for obtaining a default judgment. First, pursuant to Rule 55(a), the Clerk of Court must enter the party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise[.]" FED. R. CIV. P. 55(a). Second, pursuant to Rule 55(b)(2), the plaintiff must apply to the court for a default judgment when his or her claim is not for a sum certain or a sum that can be made certain by computation. *See* FED. R. CIV. P. 55(b)(2).[2] "Upon default, the well-pled allegations of the complaint relating to liability are taken as true, but those relating

---

[2] Pursuant to Rule 55(b)(1), the plaintiff may request the Clerk of Court enter a default judgment "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by computation[.]" FED. R. CIV. P. 55(b)(1). Here, Plaintiff moved for default judgment under Rule 55(b)(2) because "[P]laintiff's claim is not for a sum certain or a sum made certain by calculation." *Kelty v. Patterson*, 18-CV-762, 2019 WL 2417644, at *4 (E.D. Wis. June 10, 2019), *report and recommendation adopted*, 18-CV-762-JPS, 2019 WL 3501526 (E.D. Wis. July 31, 2019).

to the amount of damages suffered ordinarily are not." *Wehrs*, 688 F.3d at 892. Thus, "damages must be proved unless they are liquidated or capable of calculation." *Id.* (internal quotation marks and citation omitted). *See also Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014) ("That said, while a default judgment conclusively establishes liability, the victor must still prove up damages.").

A plaintiff seeking damages under § 1983 may recover both compensatory and punitive damages. *See Kelty v. Patterson*, 18-CV-762, 2019 WL 2417644, at *5 (E.D. Wis. June 10, 2019), *report and recommendation adopted*, 18-CV-762-JPS, 2019 WL 3501526 (E.D. Wis. July 31, 2019). Pertinently, "our decisions allow 'broad latitude' in quantifying damages, 'especially when the defendant's own conduct impedes quantification ... [—e]ven speculation has its place in estimating damages.'" *Domanus*, 742 F.3d at 303 (quoting *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011)). *See also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 383 (7th Cir. 1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer."). Additionally, "[p]unitive damages may be awarded in a 42 U.S.C. § 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Love v. Prestel*, 1:18-CV-03548-JRS-TAB, 2021 WL 2209039, at *4 (S.D. Ind. May 30, 2021) (quoting *Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007)). When evaluating an award of punitive damages, the Supreme Court has established three guideposts: "(1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered and the punitive award; and (3) the difference between the

award authorized by the jury and the penalties imposed in comparable cases." *Rainey v.
Taylor*, 941 F.3d 243, 254 (7th Cir. 2019) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559,
575 (1996)).

A district court's damages award is reviewed for an abuse of discretion and will
only be disturbed if it is plainly excessive. *Id.* "In deciding whether a damages award is
excessive, three factors guide our analysis: 'whether (1) the award is monstrously
excessive; (2) there is no rational connection between the award and the evidence,
indicating that it is merely a product of the jury's fevered imaginings or personal
vendettas; and (3) whether the award is roughly comparable to awards made in similar
cases.'" *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (quoting *G.G. v. Grindle,*
665 F.3d 795, 798 (7th Cir. 2011)).

## ANALYSIS

### I.    *Evidence of Plaintiff's Damages*

In light of the Court's prior Order granting default judgment as to Billington's
liability (Doc. 32), the Court accepts the allegations in Plaintiff's Complaint as true (*see*
Doc. 1). *See also Wehrs*, 688 F.3d at 892. But even though the Court accepts Plaintiff's
allegations as true, Plaintiff must still prove his damages. *See Domanus*, 742 F.3d at 303
("That said, while a default judgment conclusively establishes liability, the victor must
still prove up damages."). Thus, the Court now considers Plaintiff's testimony and all of
the other evidence Plaintiff has offered the Court to determine Plaintiff's damages.

At the evidentiary hearing, Plaintiff testified as to the numerous harms he suffered
and continues to suffer as a result of Billington's actions (*see generally* Doc. 36 at pp. 12-

80).[3] Plaintiff testified that he had no history of mental illness, sleeping issues or nightmares, and did not take any mental health medication, prior to Billington's abuse (*Id.* at pp. 18-19). However, beginning in March 2020, Billington began making inappropriate advances and comments to Plaintiff on a daily basis, which caused him to feel panicked and nervous (*Id.* at pp. 23-24). Billington would also send Plaintiff notes and occasional contraband gifts (cigarettes), both of which made him feel more nervous and scared (*Id.* at pp. 24-25).

Billington's various threats only worsened Plaintiff's suffering. For example, Plaintiff discussed the fear he felt when Billington mentioned his mother's name and his brother's Instagram account in one of her letters (*Id.* at p. 27). Likewise, Plaintiff said he was even more terrified when Billington told him that she personally knew the judge presiding over his criminal case because Plaintiff feared that she would make good upon her threats to tell the judge that he had raped her (*Id.* at pp. 27-28). Pertinently, when elaborating upon the two occasions of forced oral sex and one occasion of forced penetrative sex, Plaintiff explained that he was afraid to refuse Billington because of her repeated threats of reporting him for rape and engaging in gang activity, which were made even more credible based upon her conspicuously noting the imbalanced power dynamic (inmate versus supervisor) as well as their respective races and genders (*Id.* at p. 33). Plaintiff also stated that he attempted to switch shifts to a time when Billington

---

[3] Plaintiff's testimony described Billington's actions at great lengths (*see generally* Doc. 36). However, because the Court has already taken Plaintiff's allegations as true and found Billington to be liable, the current discussion will focus on the testimony and evidence regarding the harms Plaintiff has suffered.

was not working, but two weeks later he was returned to his original shift and told by
Billington that he was not "going to get away from [her]." (*Id.* at p. 35). Plaintiff testified
as to how Billington's actions and threats adversely impacted his relationships with
others – causing him to become increasing isolated and avoid engaging in conversations
with his coworkers (*Id.* at p. 29). Additionally, due to Billington's threats and abuse,
Plaintiff experienced mood swings, spent more time in his cell, and frequently lost focus
(*Id.* at pp. 29-30). Furthermore, due to Billington's threats and abuse, Plaintiff did not feel
that he could trust any prison staff (*Id.* at p. 34).

Notably, Plaintiff was subjected to unwanted kissing and groping on an almost
daily basis for approximately 18 months (*Id.* at pp. 35-36). In fact, Billington's abuse was
so frequent that Plaintiff came "to expect being kissed and groped when [he] came to
work." (*Id.* at p. 36). Moreover, regarding the three specific instances of sexual abuse,
Plaintiff testified that the instances of forced oral sex and forced penetrative sex were
physically painful (*Id.* at pp. 35-40). Plaintiff then discussed the severe trauma he suffered
as a result of the disturbing instance where Billington forced him to perform oral sex on
her while she was menstruating, which forced him to gag and nearly vomit  (*Id.* at p. 40).
Plaintiff attested to feeling highly suicidal at that time and thinking he could no longer
carry on (*Id.* at pp. 40-41). And correspondingly, Plaintiff became increasingly depressed
and anxious over the following months (*Id.*). Additionally, Plaintiff testified to frequently
experiencing nightmares related to being falsely accused and convicted of rape, which
would have placed him at greater risk of being raped by others, as well as eliminating
any chance of him being released and seeing his family in the future (*Id.* at pp. 41-42).

Plaintiff also elaborated upon the fear he felt when he learned Billington had contacted his counselor regarding his updated phone list (*Id.* at pp. 44-45). Plaintiff was deeply troubled by Billington's ability to invade his privacy to learn that he had not updated his phone list, and his concerns were exacerbated by the fact that Billington's behavior had not raised any suspicions (*Id.*). To make matters worse, Plaintiff believed that he risked segregation and/or disciplinary transfer on each occasion that he was forced to call Billington (*Id.* at pp. 45-46). Moreover, the phone calls themselves, which Plaintiff was coerced into making so that Billington could masturbate over the phone, left Plaintiff feeling isolated, afraid, upset, and suicidal (*Id.* at pp. 47-48). As a result, Plaintiff consistently failed to sleep two hours per night, which further harmed his mental health and daily work (*Id.* at p. 48).

Plaintiff also presented and discussed a request slip he wrote to Mental Health in August 2021, wherein he requested to speak with someone because he was depressed and unable to sleep (Doc. 37; *see also* Doc. 36 at pp. 52-53). Plaintiff explained that he submitted that mental health request slip after being placed in segregation because he was very afraid that Billington had made good on her threat of reporting him for rape, which left him in a bad mental state that was exacerbated by his physical isolation in segregation (Doc. 36 at pp. 53-54). Moreover, when Plaintiff finally spoke with someone in Mental Health, he was fearful to reveal what had occurred because he did not know who he could trust (*Id.* at pp. 55-56).

Unfortunately, even after Plaintiff's allegations against Billington were substantiated (*see* Doc. 40), he continues to experience anxiety, flashbacks, nightmares,

and requires further mental health treatment (Doc. 36 at pp. 77-78). Plaintiff testified and
presented medical evidence demonstrating that he was diagnosed with depression and
anxiety in October 2021 and placed on psychotropic medication (*Id.* at pp. 66-69; *see also*
Doc. 39). In addition, Plaintiff initially refused to work after being transferred to
Pinckneyville Correctional Center because he didn't feel safe to do so in light of the
prolonged abuse he suffered while working in the dietary unit at Lawrence (Doc. 36 at p.
70; *see also* Doc. 41 at p. 34) (Mental health evaluation form dated 9/10/21 noting Plaintiff
was "avoiding getting another job for fear it will happen again."). Moreover, Plaintiff
experienced suicidal ideations and nightmares in March 2022 when he was placed in
segregation without an explanation, triggering his fears of being unfairly retaliated
against by prison staff (Doc. 36 at pp. 72-73; *see also* Doc. 41 at p. 100) (Suicide potential
evaluation form which marked "yes" next to "does the individual have a plan for
suicide?"). Plaintiff concluded his testimony by recounting all the prolonged harms he
suffers from as a result of Billington's abuse, which was corroborated by extensive
medical records documenting Plaintiff's mental health decline, suicide potential, and
need for crisis watch (Doc. 36 at pp. 77-81; *see also* Doc. 41).

Plaintiff's mother, Ms. Dorothy Williams, also testified at the evidentiary hearing
(Doc. 36 at pp. 81-96). Ms. Williams stated that she used to speak with Plaintiff at least
once a week, if not more (*Id.* at pp. 83-85). She observed that beginning in the spring or
summer of 2020, Plaintiff became quieter, more withdrawn, less energetic and happy,

and no longer discussed his enjoyment of working in the kitchen (*Id.* at pp. 85-87).[4] Their calls became shorter and less frequent, and Plaintiff avoided speaking to other family members when he did call (*Id.* at pp. 87-89). When Ms. Williams eventually learned of what had happened, Plaintiff appeared ashamed and continued to isolate himself (*Id.* at pp. 92-94).

In summation, Plaintiff has presented sufficient evidence of the numerous injuries he suffered and continues to suffer from as a result of Billington's prolonged harassment and sexual assaults. The entire ordeal lasted for approximately 18 months and involved nearly daily kissing and groping, one instance of forced penetrative sex, and at least two instances of forced oral sex. Furthermore, Plaintiff was forced to call Billington on multiple occasions and forced to work in dietary on the same shift that Billington worked, even after Plaintiff attempted to switch shifts. In other words, no matter what Plaintiff did, he could not "get away from [Billington]" (Doc. 36 at p. 35). Additionally, Billington's threats leveraged the power imbalance between IDOC staff (Billington) and inmates (Plaintiff), manipulated perceived racial and gender disparities, and demonstrated a concerning level of knowledge of both Plaintiff's family and his ongoing criminal proceedings.

Tragically, due to Billington's prolonged and repetitive abuse, Plaintiff went from being an individual who was social, frequently called his family, enjoyed working in the

---

[4] Ms. Williams owns a soul food restaurant in Chicago (Doc. 36 at p. 82). Ms. Williams testified that Plaintiff was particularly eager to gain experience working in the kitchen because they intend him to help her run the business upon his release (*Id.* at pp. 85-86).

dietary unit, and had no documented history of mental health or sleeping disorders; to being an individual who was diagnosed with depression and anxiety, prescribed psychotropic medication, experienced suicidal ideations, had and continues to have issues with sleep and nightmares, isolated himself from family and friends, lost interest in his work (and even refused to work for several weeks), and continues to face triggers that adversely impact his mental health. Put simply, Plaintiff has provided sufficient evidence to establish his entitlement to damages based upon the harms he has suffered as a direct result of Billington's abuse.

## II.        Damages Determination

The final issue before the Court then is to determine the appropriate amount of damages to award Plaintiff in light of the numerous, severe harms he has suffered because of Billington's conduct. Given the facts of this case, Plaintiff has requested $500,000 in compensatory damages and $1,000,000 in punitive damages (*see* Doc. 29 at p. 2, Doc. 42 at p. 15).[5] Plaintiff cites to several cases involving similar harms to support his requested damages award (*see* Doc. 42 at pp. 13-15), including: *Kelty v. Patterson*, No. 18-CV-762, 2019 WL 2417644, at *8 (E.D. Wis. June 10, 2019); *Quickle v. Baldwin*, No. 18-CV-1332-SEM-TSH, slip. op. (C.D. Ill. Sept. 20, 2020); *Doe v. United States*, No. CV-17-01991-PHX-GMS, 2018 WL 2431774 (D. Ariz. May 30, 2018); *Doe v. Green*, No. 17-CV-1765, 2021 WL 2188534, at *3 (S.D.N.Y April 29, 2021); and *Doe v. Macleod*, No. 18-CV-03191-SEM-KLM, 2023 WL 2698672 (C.D. Ill. Mar. 29, 2023) (the jury's verdict in *Macleod* can be found

---

[5] "[T]o further bolster the reasonableness of his request for damages, [Plaintiff], through counsel, does not request attorneys' fees despite his right to do so." (Doc. 42 at p. 3). As such, the Court only considers the amount of compensatory and punitive damages to award Plaintiff.

at Dkt. 223 on CM/ECF). While the Court is cognizant that "case comparisons 'are rarely dispositive given the fact-specific nature of damages claims[,]'" the Court has nevertheless considered these cases, as well as many other cases involving sexual assaults in a prison setting, to help guide the Court's damages determination. *See Kelty*, 2019 WL 2417644 at *6 (quoting *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009)).

In *Kelty*, the plaintiff was a female inmate who was sexually assaulted on three occasions by the defendant guard over the course of one summer. *Id.* at *1-2. In addition, the defendant repeatedly made inappropriate comments to the plaintiff and attempted to observe her nude body. *Id.* Ultimately, a default judgment was entered against the defendant guard and the plaintiff was awarded $900,000 in compensatory damages and $1,500,000 in punitive damages. *Id.* at *8. In settling on that specific compensatory damages award, the court reasoned that the repeat nature of the defendant's assaults, as well as the evidence of the plaintiff's mental health decline justified the $900,0000 award. *Id.*at *7. Likewise, the court found punitive damages to be appropriate based upon the defendant's repeated abuse of his position of power. *Id.* at *8.

In *Quickle*, the plaintiff was a male inmate who was forced into having sexual relations with a female food supervisor. *See* Case No. 18-CV-1332, Dkt. 107. The plaintiff experienced sexual harassment over a period of approximately six months, including being coerced into penetrative sex and oral sex based upon the defendant's threats of retaliation, which included "an implied threat that she would accuse Plaintiff of rape." *Id.* After the defendant defaulted, a damages hearing was held and the plaintiff requested $500,000 in compensatory damages and $1,000,000 in punitive damages. *Id.* However, the

court did not award the plaintiff his requested damages and instead awarded $100,000 in
compensatory damages and $200,000 in punitive damages. *Id.* Notably, in explaining the
reduced damages award, the court emphasized that some of the harm the plaintiff
suffered was attributable to the individuals who caused him to be falsely disciplined and
some of the harm was due to a lack of prison resources for male inmates who suffered
sexual abuse, neither of which could be attributed to the defaulting defendant. *Id.*
("Further, the cases cited by Plaintiff are distinguishable because in this case there are
separable harms attributable to different actors.").

In *Doe v. United States*, the plaintiff was a female inmate who was assaulted by the
corrections officer defendant over a period of several months. 2018 WL 2431774 at *8.
During the attacks, the defendant "inappropriately intimidated, coerced, victimized, and
assaulted the Plaintiff by, among other things, forcibly kissing her, touching her buttocks,
putting his hands underneath Plaintiff's clothes and panties, [] inserting his finger into
the Plaintiff's vagina, ... [and] also forced Plaintiff's hand to touch his erect penis." *Id.* As
a result, the plaintiff reported suffering from sleep loss, anxiety, fear, depression,
humiliation, and fright, which continued even after her release. *Id.* at *9. Based upon this
evidence, the court awarded the plaintiff $2,500,000 in compensatory damages and
$1,250,000 in punitive damages. *Id.* The court reasoned that punitive damages were
justified because of the power dynamic between the plaintiff and the defendant
correctional officer, the repeated instances of abuse, the defendant's threats of retaliation,
and the defendant's admission of guilt in a related criminal prosecution. *Id.*

In *Green*, the plaintiff, a female inmate, was assaulted by the defendant corrections

officer who "assaulted her by grabbing, pushing, and restraining her against her cell wall; kissing, biting, and licking Plaintiff's upper body, including her exposed breasts; and putting his hand down Plaintiff's shorts and fondling her genitalia and groin." 2021 WL 2188534 at *2. Following the assault, the plaintiff suffered from stress, anxiety, shame, sleep loss, the fear of being assaulted again during the remaining 26 months of her sentence, and self-harm by cutting her wrists. *Id.* at *5. The court awarded the plaintiff $350,000 in compensatory damages and $200,000 in punitive damages. *Id.* at *7-9. In deciding to award that specific amount, the court acknowledged that it was a lower figure than in many other cases involving sexual assaults in prison because "unlike those cases, this case does not involve either a completed rape or repeated assaults." *Id.* at *7.

Finally, in *Macleod*, the plaintiff was a female inmate at Logan Correctional Center who sued Richard Macleod, her family services counselor, for repeated instances of sexual assault and harassment over a ten-month period. *See* 2023 WL 2698672 at *3.[6] Specifically, the plaintiff was coerced into having sexual intercourse with Macleod on two to three occasions and into performing oral sex on Macleod on two occasions. *Id.* The plaintiff indicated that Macleod threatened her with harsh punishments, including an additional year of jail time, if she reported his abuse. *Id.* Additionally, the plaintiff was required to visit her counselor (i.e., Macleod) to make bi-weekly phone calls with her daughter. *Id.* On several occasions, Macleod masturbated or exposed his penis to the

---

[6] *Macleod* was resolved by a jury verdict. *See Doe v. Macleod*, 18-CV-03191, 2024 WL 987559, at *1 (C.D. Ill. Mar. 7, 2024) (denying Defendants' motion for judgment as matter of law or new trial, while also recounting the jury's verdict and award of damages). Therefore, unless otherwise specified, the Court's citations are to the summary judgment order in *Macleod*, as that order summarizes the plaintiff's allegations and the case's procedural history. *See Macleod*, 2023 WL 2698672 at *3.

plaintiff during those phone calls. *Id.* The plaintiff alleged that because of Macleod's conduct, as well as the conduct of the other non-defaulting defendants, she suffered severe emotional distress including humiliation, depression, rage, anxiety, insomnia, panic attacks, and post-traumatic stress. *Id.* at *1.[7] Macleod did not appear or file a responsive pleading. *Id.* Therefore, the Court granted the plaintiff's motion for default judgment as to Macleod's liability but reserved the question of damages for the jury as the case was proceeding to trial against two other, non-defaulting defendants. *Id.* A jury trial ensued and ultimately, the plaintiff was awarded $8,000,000 in compensatory damages against Macleod and the two other defendants (who the jury found to be liable), and $10,000,000 in punitive damages against Macleod alone. *See Doe v. MaCleod*, 18-CV-03191, 2024 WL 1335041, at *1 (C.D. Ill. Mar. 28, 2024) (citing Dkt. 224).[8]

Given the highly troubling facts presented in this case and the severe harms that Plaintiff has established, the Court finds Plaintiff's compensatory damages request to be reasonable and awards Plaintiff $500,000 in compensatory damages. "While no amount of money can justly compensate a plaintiff who experienced what Plaintiff endured, this damages award is consistent with awards in similar cases and thus is fair and reasonable compensation for the harm [Plaintiff] experienced" due to Billington's repeated sexual assaults and abuse. *Green*, 2021 WL 2188534 at *4.

Here, unlike in *Green* (which still awarded $350,000 in compensatory damages),

---

[7] *See* the Amended Complaint in *Macleod* for additional details regarding the plaintiff's injuries. *See* Dkt. 37, Case No. 18-CV-03191 (C.D. Ill.).

[8] The court's order from this date also awarded over $2,000,000 in attorney's fees. *Doe v. MaCleod*, 18-CV-03191, 2024 WL 1335041 (C.D. Ill. Mar. 28, 2024).

Plaintiff was sexually assaulted on numerous occasions and kissed/groped on an almost daily basis for 18 months. *See also Hampton v. Cagle*, 4:20-CV-04210-SLD-JEH, 2024 WL 4235164, at *3 (C.D. Ill. June 27, 2024) (awarding $3,000,000 in compensatory damages to female inmate who was sexually assaulted on one occasion). In fact, none of the cases discussed above involved such a prolonged period of sexual and psychological abuse. On top of that, the specific, unconscionable circumstances Plaintiff was forced to endure during several of Billington's sexual assaults represent an aggravating factor not seen in the cases described above. For instance, Billington forced Plaintiff to perform oral sex on her while she was menstruating, which nearly caused Plaintiff to vomit and made him feel highly suicidal (*see* Doc. 1 at p. 10). As a direct result of Billington's prolonged sexual abuse and threats, Plaintiff suffered and continues to suffer from the numerous psychological effects discussed above. And to be clear, the Court has no doubts that it was Billington and Billington alone who is responsible for the entirety of the harms Plaintiff has suffered. *See Wehrs*, 688 F.3d at 892 (explaining that a defaulting party may raise the issue of causation as it relates to calculating damages).

Furthermore, Plaintiff was subjected to repeated threats of punishment, including for rape, which involves a substantially longer jail sentence than the threat of an extra year of imprisonment made in *Macleod*. 2023 WL 2698672 at *11. Billington's threats were bolstered by her demonstrated knowledge of Plaintiff's family, her manipulation of prison power dynamics, race, and gender, her knowledge of Plaintiff's criminal proceedings and purported familiarity with the judge presiding over that case, her ability to control his work schedule (both during day-to-day operations and in his overall shift

assignment), and her success in obtaining personal information from Plaintiff's counselor (or another similarly-situated individual).

Additionally, unlike in any of the cases discussed above, Plaintiff was not even safe from Billington's abuse on the days she was not working. Instead, Plaintiff was forced to call Billington on her days off and listen to her masturbate over the phone with him to avoid her retaliation – all while fearing that he would be punished for making such phone calls. Also, unlike in cases such as *Macleod* and *Green* where the end of the plaintiff's incarceration was in sight and could provide some relief, here Plaintiff's projected parole date is not until 2038. *See* ILLINOIS DEP'T OF CORR., *Individual in Custody Search*, https://idoc.illinois.gov/offender/inmatesearch.html. This means that many of the adverse impacts of Billington's violative conduct that are triggered by the prison setting, such as Plaintiff's fear of being falsely disciplined and/or abused by prison staff, will continue to harm him for many years to come. For all the reasons discussed above, the Court awards Plaintiff the entirety of his compensatory damages request, $500,000.

Likewise, the Court finds Plaintiff's request for $1,000,000 in punitive damages to be justified under these circumstances. The first and most important guidepost to consider when testing an award for punitive damages is the reprehensibility of the defendant's conduct. *Rainey v. Taylor*, 941 F.3d 243, 254 (7th Cir. 2019) (explaining that the first factor is the most important factor). To put it bluntly, Billington's job was to keep inmates safe, but she did the opposite. *See Kelty*, 2019 WL 2417644 at *8. And to perpetuate those actions and then keep them from coming to light, Billington impermissibly leveraged every tool at her disposal to fulfill her own evil and selfish motives with no

concern for Plaintiff's rights or wellbeing – from making threats based upon power dynamics, race, and gender, to providing frightening details of Plaintiff's family. Thus, Plaintiff's testimony and supporting evidence unequivocally demonstrate that punitive damages are warranted to punish Billington for her repeated, reprehensible conduct that occurred over an extended period of time. "Further, as recognized by courts in this Circuit, there is something particularly reprehensible about a law enforcement officer assaulting an inmate under [her] care." *Green*, 2021 WL 2188534 at *8 (awarding $200,000 in punitive damages but noting punitive damage awards are higher in cases "featuring repeated attacks [and/or] rapes[.]"). *See also See also J.K.J. v. Polk Cnty.*, 960 F.3d 367, 376 (7th Cir. 2020) (affirming the jury's punitive damages award of $3,750,000 to both of the plaintiffs who endured repeated sexual assaults at the hands of a correctional officer). In addition, similar to the defendant's guilty plea considered in *Doe v. United States*, 2018 WL 2431774 at *9, here, Plaintiff's claims against Billington were found to be substantiated by an IDOC PREA investigation and forwarded to the Lawrence County State's Attorney for possible prosecution against Billington for custodial sexual misconduct (Doc. 40).

Turning to the second guidepost, which looks at the disparity between the actual harm suffered and the punitive award, the Court finds that a punitive award of $1,000,000 is appropriate in light of the severe harm Plaintiff suffered and the Court's corresponding compensatory damages award of $500,000. *See Rainey*, 941 F.3d at 255 (describing the second guidepost as a test to see if the ratio between compensatory and punitive damages is reasonable, and then finding that a punitive damages award of approximately six times

the compensatory award was reasonable). In this case, the punitive damages award is double the compensatory damage award, easily falling within Seventh Circuit precedent. *See Id.*

Finally, regarding the third guidepost, a punitive damages award of $1,000,000 is well within the range of punitive damages awarded in cases involving similar facts. In fact, those cases generally do not involve nearly as long a period of abuse or as many forms of deeply troubling conduct as Billington perpetrated here. *See, e.g.*, *Macleod*, 2023 WL 2698672 ($10,000,000 punitive damages award against defaulting defendant); *Doe v. United States*, 2018 WL 2431774 ($1,250,000 punitive damages award); *Kelty*, 2019 WL 2417644 ($1,500,000 punitive damages award); *Noonan v. Becker*, 14-CV-4084, 2018 WL 1738746, at *8 (S.D.N.Y. Apr. 10, 2018) ($1,000,000 punitive damages award in case where defendant police officer drugged and raped the plaintiff); *Martin v. Cnty. of Milwaukee*, 14-CV-200-JPS, 2017 WL 4326512, at *4 (E.D. Wis. Sept. 28, 2017) ($5,000,000 punitive damages award, which the jury calculated by adding $1,000,000 per incident of sexual assault), *rev'd in part*, 904 F.3d 544 (7th Cir. 2018) (reversing and vacating indemnification claim against the County, but leaving intact the $5,000,000 punitive damages award against the defendant who committed the sexual assaults). For all these reasons, the Court awards Plaintiff the entirety of his punitive damages request, $1,000,000.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiff's Motion for Default Judgment against Defendant Billington and awards Plaintiff $500,000 in compensatory damages and $1,000,000 in punitive damages.

The Clerk of Court is directed to enter default judgment in favor of Plaintiff Williams and against Defendant Billington in the amount of $500,000 in compensatory damages and $1,000,000 in punitive damages, and then to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED:** July 1, 2025

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**